# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | |
|---|---|
| **TIARA THOMPSON**, on behalf of herself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| **DOTHOUSE HEALTH, INC.,** | |
| Defendant. | |

Tiara Thompson ("Plaintiff"), through her attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against DotHouse Health, Inc. ("DotHouse" or "Defendant"), alleging as follows, based upon information and belief, investigation of counsel, and personal knowledge of Plaintiff.

## INTRODUCTION

1.    This class action arises from Defendant's failure to protect highly sensitive data of 185,795 individuals residing in Massachusetts alone.[1] Residents of other states, including but not limited to Vermont, were also impacted by the breach.[2]

2.    Although DotHouse became aware of the Data Breach on November 28, 2022, it waited until July 14, 2025 – *958 days* – until it notified the Massachusetts Attorney General.[3]

---

[1] *Data Breach Notification Report 2025,* MASS.GOV, https://www.mass.gov/lists/data-breach-notification-reports (last visited July 18, 2025); and *DotHouse Health Data Breach Affects 185,795 Patients* (July 16, 2025), CLAIMDEPOT, https://www.claimdepot.com/data-breach/dothouse-health (last visited July 18, 2025).

[2] *Data Breach Notice to Consumers*, OFFICE OF THE VERMONT ATTORNEY GENERAL https://ago.vermont.gov/document/2025-07-14-dothouse-health-data-breach-notice-consumers (last visited July 18, 2025).

[3] *Data Breach Notification Report 2025,* MASS.GOV, https://www.mass.gov/lists/data-breach-notification-reports (last visited July 18, 2025).

3.    The breach took place when an unauthorized actor "gained access or downloaded certain files stored on certain computer systems" containing sensitive information between October 31, 2022 and November 27, 2022. *See* Exhibit A.

4.    Critically, as described *infra*, the notorious cybercriminal group "ALPHV BlackCat" revealed that it had accessed and exfiltrated sensitive information from DotHouse during the Data Breach.

5.    Despite collecting and storing the highly sensitive private identifying information ("PII") and health information ("PHI") (collectively, "PII/PHI") of hundreds of thousands of current and former patients, DotHouse's cybersecurity measures were so inadequate that it took DotHouse twenty-seven (27) days to even realize its computer systems had been breached.

6.    After DotHouse finally discovered that cybercriminals had gained access to its computer systems, it claims to have "launched an investigation, with the assistance of cybersecurity specialists, to determine the full nature and scope of the event." Ex. A.  Although over two and half years have passed, DotHouse claims it was "not able to identify with specificity what information was impacted," but admits that the information encompassed both PII and PHI, including "full names, dates of birth, addresses, medical record numbers, diagnoses/conditions, medications, other treatment information, and claims information." *Id.*

7.    Worse, despite discovering the breach in November 2022, DotHouse waited *958 days* until it began notifying impacted patients that it had lost control over its computer network. The Notice located on the website of the Massachusetts Attorney General's Office is attached as Exhibit A (the "Notice"). Plaintiff's Notice is attached as Exhibit B.

8.    Upon information and belief, cybercriminals were able to breach Defendant's systems over a period of twenty-seven days because Defendant failed to adequately train its

employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the PII/PHI of Plaintiff, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PH—rendering it an easy target for cybercriminals.

9.     Curiously, DotHouse reported to the U.S. Department of Health and Human Services, Office for Civil Rights, that the Data Breach had impacted only 10,000 individuals in January 2023.[4] Despite the fact that DotHouse has a duty to supplement or clarify its previously submitted notice to the Office for Civil Rights upon the discovery of additional information, DotHouse never informed the Office for Civil Rights that the Data Breach impacted well over 100,000 individuals.[5]

10.     Defendant's Notice intentionally obfuscates the nature of the Data Breach and the threat it posed. The Notice failed to disclose how many people were impacted, how the Data Breach happened, who perpetrated the breach, whether a ransom was demanded or paid, whether it was able to secure its systems during or after the breach, or why it took the Defendant approximately 958 days before it finally began notifying some victims that cybercriminals had gained access to their highly private information.

11.     Additionally, the information contained within Defendant's Notice is self-contradictory. For example, on the one hand DotHouse claims its "electronic medical records database was not impacted during the event," while on the other hand DotHouse admits that medical record numbers, medications, diagnoses and conditions, and other treatment information

---

[4] *Case Currently Under Investigation – DotHouse Health Incorporated,* U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,  https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited July 18, 2025).
[5] *Submitting a Notice of a Breach to the Secretary,* U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/breach-notification/breach-reporting/index.html (last visited July 18, 2025)

may have been impacted. Worse, DotHouse does not even unambiguously admit that cybercriminals stole files, instead stating that the cybercriminals "appeared to have accessed or downloaded certain files," when the notorious ransomware gang ALPHV BlackCat stated on its Dedicate Leak Site that it stole 800 gigabytes of data.

12.     Defendant's deliberate failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII/PHI.

13.     Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII/PHI misuse.

14.     In failing to adequately protect its current and former patients' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed an unknown number of its current and former patients.

15.     Plaintiff and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiff and members of the proposed Class trusted Defendant with their PII/PHI. But Defendant betrayed that trust when Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

16.     Plaintiff Tiara Thompson is a patient of Defendant and victim of the Data Breach. Her name, date of birth, address, medical record number, diagnosis/condition, medications, other treatment information, and claims information could have been stolen in the Data Breach.

17.     The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiff and the Class was exactly that— private. Not anymore. Now, their private information is permanently exposed and unsecure.

18.     Plaintiff seeks on behalf of herself and the putative class monetary damages and injunctive relief including lifetime credit monitoring and ID theft monitoring.

## PARTIES

19.     Plaintiff, Tiara Thompson, is a natural person and citizen of Dorchester, Massachusetts, where she intends to remain.

20.     Defendant DotHouse Health, Inc., is a nonprofit corporation incorporated in Massachusetts, with its principal place of business at 1353 Dorchester Avenue, Dorchester MA 02122.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Members of the proposed Class are citizens of different states than Defendant and there are over 100 putative Class members. After all, at least 185,795  persons were affected, including persons residing in at least Vermont and Massachusetts.[6]

22.     This Court has personal jurisdiction over Defendant because it is located in Dorchester, Massachusetts, it regularly conducts business in Massachusetts, and has sufficient minimum contacts in Massachusetts.

23.     Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

---

[6] *See Data Breach Notification*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/f6db22d1-7945-48b6-b727-0b134a5b4e38.html *and Data Breach Report 2025,* MASS.GOV, https://www.mass.gov/lists/data-breach-notification-reports (last visited March 24, 2025).

## BACKGROUND

### *Defendant Collected and Stored the PII/PHI of Plaintiff and the Class*

24.      DotHouse is a healthcare organization based in Massachusetts. Working in partnership with Boston Medical Center, DotHouse is a licensed Health Center of the hospital and offers a variety of care including primary, dental, eye, behavioral health, nutrition, cardiology, and acupuncture.

25.      On information and belief, DotHouse accumulates highly private PII/PHI of its patients, including information protected by HIPAA. Given its age, DotHouse has accrued over 50 years of private health information.

26.      In collecting and maintaining its patients' PII/PHI, DotHouse agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII/PHI.

27.      DotHouse understood the need to protect its current and former patients' PII/PHI and prioritize its data security.

28.      DotHouse states, "the privacy ands ecurity of information is amongst our highest priorities." Exs. A & B. It follows that secure and reliable data storage should be deeply important to DotHouse.

29.      Despite recognizing its duty to do so, on information and belief, DotHouse has not implemented reasonable cybersecurity safeguards or policies to protect the PII/PHI of its current and former patients, or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, DotHouse leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to patients' PII/PHI.

***Defendant Failed to Safeguard the PII/PHI of Plaintiff and the Class***

30.     Plaintiff is a patient of Defendant.

31.     Plaintiff received Defendant's Notice, dated July 14, 2025, informing her that her PII/PHI may have been compromised, including her name, date of birth, address, medical record number, diagnosis/condition, medications, other treatment information, and claims information. As a condition of receiving medical services from Defendant, Plaintiff provided Defendant with her PII/PHI.

32.     On information and belief, Defendant collects and maintains its current and former patients' unencrypted PII/PHI in its computer systems.

33.     In collecting and maintaining PII/PHI, Defendant implicitly agreed that it will safeguard the data using reasonable means according to state and federal law.

34.     For over twenty-seven days, from October 31, 2022, through November 27, 2022, cybercriminals hacked Defendant's network and accessed extremely sensitive information, including protected health information.

35.     It is unclear why it took Defendant twenty-seven days to realize its computer systems had been hacked. Regardless, this unexcusable delay in discovering the Data Breach demonstrates Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of thousands of its patients' and highly private information continuously over the course of two months.

36.     On or about July 14, 2024–an appalling *958 days* after the Data Breach first occurred—Defendant finally began notifying some Class Members the Data Breach. Ex. B.

37.     Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

38.     Despite its duties to safeguard PII/PHI, Defendant did not in fact follow industry standard practices in securing patients' PII/PHI, as evidenced by the Data Breach.

39.     In response to the Data Breach, Defendant contends "[w]e further enhanced our existing security by implementing additional security measures to reduce the likelihood of a similar event occurring in the future." Exs. A & B. Although Defendant fails to expand on what these "additional security measures" are in any substantive detail, such "additional security measures," if implemented at all, should have been in place before the Data Breach

40.     Through its Notice, Defendant recognized the actual imminent harm and injury that flowed from the Data Breach, so it encouraged breach victims to be "remain vigilant against incidents of identity theft and fraud by reviewing your account statements, credit reports, and explanations of benefits for suspicious activity and to detect errors." Exs. A & B.

41.     Despite advising the victims to remain vigilant, Defendant waited an unreasonable amount of time before it began notifying victims, depriving Plaintiff and the Class of the earliest opportunity to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

42.     On information and belief, Defendant has offered complimentary credit monitoring services to victims, which does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the information compromised involves PII/PHI that cannot be changed, including dates of birth and medical treatment information.

43.     Even with several months of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' PII/PHI is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

44.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII/PHI (although in Plaintiff's case, her Social Security number was compromised). Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff and the Class's financial accounts.

45.     On information and belief, Defendant failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its patients' PII/PHI. Defendant's negligence is evidenced by its failure to prevent the Data Breach, and to stop cybercriminals from accessing the PII/PHI it stored in its network.

46.     Furthermore, Defendant intentionally obfuscates the nature of the breach, failing to clearly inform the public how many people were impacted, how the Data Breach happened, who perpetrated the breach, whether a ransom was demanded or paid, whether it was able to secure its systems during or after the breach, or why it took the Defendant approximately 958 days before it finally began notifying some victims that cybercriminals had gained access to their highly private information.

47.     Additionally, Defendant confusingly claims its "electronic medical records database was not impacted during the event," while on the other hand DotHouse admits that medical record numbers, medications, diagnoses and conditions, and other treatment information may have been impacted. Worse, DotHouse does not even unambiguously admit that cybercriminals stole files, instead stating that the cybercriminals "appeared to have accessed or downloaded certain files," when the notorious ransomware gang ALPHV BlackCat stated on its

Dedicate Leak Site that it stole 800 gigabytes of data.

48.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts.

49.     Despite Defendant's intentional opacity about the root cause of the data breach and its impact, several facts can be gleaned from the notice including that: (1) this data breach was the work of cybercriminals; (2) cybercriminals successfully infiltrated DotHouse's network environment; and (3) once inside, cybercriminals targeted highly private information for download and theft.

50.     In the context of data breach notice letters of this type, Defendant's use of the phrase "appeared to have accessed" and "*could have* been affected" is misleading. Companies only send notice letters because data breach notification laws require them to do so, and notice letters are only sent to those persons who Defendant itself reasonably believes had PII/PHI acquired by an unauthorized individual.

51.     By sending notice letters to Plaintiff and Class Members, Defendant admits that it itself reasonably believes Plaintiff's name, date of birth, address, medical record number, diagnosis/condition, medications, other treatment information, and claims information was acquired by an unnamed third party.

### ***ALPHV BlackCat Obtained the PII/PHI of Plaintiff and the Class and Posted it for Sale***

52.     Through its inadequate security practices, Defendant exposed Plaintiff's and the Class Members' PII/PHI for theft and sale on the Dark Web.

53.     Worryingly, the cybercriminals that obtained Plaintiff's and Class members' PII/PHI appear to be the notorious cybercriminal group "ALPHV BlackCat."[7]

---

[7] *Victims*, RANSOMWARE LIVE, https://www.ransomware.live/search?q=dothouse&scope=all (last visited July 18 2025).

54.    On or around December 10, 2022, ALPHV BlackCat claimed credit for the Data Breach in a post on its Dedicate Leak Site, on the Dark Web.[8]

55.    On its Dark Web website, ALPHV BlackCat bragged that it had stolen over 800 gigabytes of data.[9]  For context, 1 gigabyte is equivalent 1,000 megabytes, and the entire written works of Shakespeare could fit inside just 5 megabytes.[10]

56.    A copy of ALPHV BlackCat's post to its Dark Web website is posted below:[11]



---

[8] *Id.*

[9] *Victims*, RANSOMWARE LIVE, https://www.ransomware.live/id/ZG90aG91c2VoZWFsdGhvcmdAYWxwaaHY =#screenshot (last visited July 18, 2025). *See also* RANSOMLOOK, https://www.ransomlook.io/search (last visited July 18, 2025)

[10] Paulette Kehely, *How Many Documents in a Gigabyte?* (April 2, 2020), DWR EDISCOVERY, https://www.digitalwarroom.com/blog/how-many-pages-in-a-gigabyte (last visited July 18, 2025)

[11] *Supra, note 9.*

57.    Thus, on information and belief, ALPHV BlackCat has **already leaked** the stolen PII/PHI of thousands of Defendant's current and former patients.

58.    Thus, on information and belief, Plaintiff's and the Class's stolen PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

59.    Even if Defendant paid ALPHV BlackCat a ransom, the PII/PHI of Plaintiff and the Class is still not secure. Indeed, cybercriminals often demand a ransom in exchange for assurances that the stolen data will not be published, and the sale or publish it anyways.

60.    Importantly, DotHouse does not unambiguously claim that files were not stolen from its systems, nor can it given the data posted by ALPHV BlackCat.

61.    Therefore, upon information and belief, DotHouse's Notice to Plaintiff and the Class is false, intentionally misleading, and intentionally downplays the severity of the Data Breach and the threat it poses to thousands of individuals.

### ***Defendant Knew—or Should Have Known—of the Risk of a Data Breach***

62.    It is well known that PII/PHI, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

63.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

64.    In fact, out of twenty industries that were analyzed, the healthcare industry is number eleven for highest count of ransomware attacks from January 2022 to January 2023.[12] It follows that DotHouse faces a greater risk of a data breach than other companies in other industries.

---

[12] *Ransomware Statistics: Who is targeted the most?* NORDLOCKER, https://nordlocker.com/ransomware-attack-statistics/ (last visited July 18, 2025).

65.     In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[13]

66.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[14]

67.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in the construction industry, including Defendant.

68.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII/PHI private and secure, Defendant failed to take appropriate steps to protect the PII/PHI of Plaintiff and Class Members from being compromised.

69.     This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included extortion and threatening to release stolen data.

70.     In light of the information readily available and accessible before the Data Breach, Defendant, knew or should have known that there was a foreseeable risk that Plaintiff's and Class

---

[13] *2024 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter. org/publication/2024-data-breach-report/ (last visited March 24, 2025).

[14] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited March 24, 2025).

Members' PII/PHI could be accessed, exfiltrated, and published as the result of a cyberattack. Data breaches are so prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

***Plaintiff's Experience and Injuries***

71.     Plaintiff is a patient of Defendant and a data breach victim, having received Notice of the Data Breach on July 18, 2024.

72.     As a condition of receiving medical services, Defendant required Plaintiff to provide her PII/PHI, including at least her name, date of birth, address, Social Security Number, and health information.

73.     Plaintiff provided her PII/PHI to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

74.     Had Plaintiff known that Defendant does not adequately protect PII/PHI, she would not have agreed to provide her PII/PHI to it.

75.     Plaintiff is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

76.     As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiff's PII/PHI for theft by cybercriminals and sale on the Dark Web.

77.     Indeed, given ALPHV BlackCat's Dark Web post, Plaintiff's PII/PHI has been published, or will be published imminently by ALPHV BlackCat for further theft and sale on the Dark Web.

78.     Plaintiff does not recall ever learning that her PII/PHI was compromised in former

a data breach incident, other than the breach at issue in this case.

79.     Defendant deprived Plaintiff of the earliest opportunity to guard herself against the

Data Breach's effects by failing to promptly notify her about the Data Breach.

80.     Plaintiff suffered actual injury from the exposure of her PII/PHI —which violates

her rights to privacy.

81.     Plaintiff suffered actual injury in the form of damages to and diminution in the

value of her PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant

was required to adequately protect.

82.     Plaintiff has spent time and made reasonable efforts to mitigate the impact of the

Data Breach, including but not limited to researching the Data Breach, reviewing credit card and

financial account statements, changing her online account passwords, and monitoring her credit

information.

83.     Plaintiff has already spent many hours on the Data Breach, and will continue to

spend valuable time she would have otherwise spent on other activities, including but not limited

to, work and/or recreation. Plaintiff's efforts were reasonable and necessary given that Defendant

advised her to monitor her accounts for suspicious activity, and ALPHV BlackCat has published

stolen PII on the Dark Web.

84.     Plaintiff fears for her personal financial security and uncertainty over what PII/PHI

was exposed. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear,

and frustration because of the Data Breach. Plaintiff is experiencing anxiety, distress, and fear

regarding how the exposure and loss of her Social Security number will impact her. This goes far

beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a

Data Breach victim that the law contemplates and addresses. These emotional injuries were caused by Plaintiff's exposure to a heightened risk—of identity theft and fraud—which has been substantially elevated because ALPHV BlackCat published stolen PII on the Dark Web.

85.     Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII/PHI being placed in the hands of unauthorized third parties. This injury is worsened by Defendant's unclear Notice and failure to promptly inform Plaintiff about the Data Breach.

86.     As a result of its inadequate cybersecurity measures and data destruction policies, Plaintiff suffered multiple instances of identity theft and fraud.

87.     Following the Data Breach, Plaintiff noticed fraudulent Apple charges, that were not hers.

88.     Plaintiff has also experienced a substantial increase in scam and spam messages, suggesting her PII is now in the hands of cybercriminals.

89.     Once an individual's PII/PHI is for sale and access on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[15] Plaintiff's name, date of birth, address, medical record number, diagnosis/condition, medications, other treatment information, and claims information were compromised as a result of the Data Breach.

90.     Plaintiff has a continuing interest in ensuring that her PII/PHI, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches. Given the fact that DotHouse did not even discover the Data Breach for twenty-seven days, and still feigns ignorance regarding the scope of the Data Breach, there is a substantial risk of another breach of Defendant's systems, or that a breach is certainly impending.

---

[15] *What do Hackers do with Stolen Information,* AURA, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited July 18, 2025).

***Plaintiff and the Class Suffered Common Injuries and Damages Due to Defendant's Conduct***

91.    Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII/PHI that can be directly traced to Defendant.

92.    As a result of Defendant's failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the class have suffered or are at an increased risk of suffering:

    a.   Identity theft and fraud;

    b.   The loss of the opportunity to control how their PII/PHI is used;

    c.   The diminution in value of their PII/PHI;

    d.   The compromise and continuing publication of their PII/PHI;

    e.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    f.   Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

    g.   Delay in receipt of tax refund monies;

    h.   Unauthorized use of stolen PII/PHI; and

    i.   The continued risk to their PII/PHI, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII/PHI in its possession.

*Significant Risk of Continued Identity Theft*

93.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

94.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

95.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

96.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

97.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[16] Criminals in particular favour the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is

---

[16] *What Is the Dark Web?* EXPERIAN, available at https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 18, 2025).

ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[17] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

98.    The unencrypted PII/PHI of Plaintiff and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII/PHI may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' PII/PHI.

99.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

100.    For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[18]

101.    It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

---

[17] *Id.*
[18] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

102.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

103.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

104.    Identity thieves can also use an individual's personal data and PII/PHI to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[19]

105.    One example of criminals piecing together bits and pieces of compromised PII/PHI to create comprehensive dossiers on individuals is called "Fullz" packages.[20] These dossiers are

---

[19] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 18, 2025).
[20] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone

both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII/PHI, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

106.    The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

107.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[21]

---

with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited July 18, 2025).

[21] *2019 Internet Crime Report* (Feb. 11, 2020) FBI.GOV, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 18, 2025).

108.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[22] Yet, Defendant failed to rapidly report to Plaintiff and the Class that their PII/PHI was stolen.  Defendant's failure to promptly and properly notify Plaintiff and Class members of the Data Breach exacerbated Plaintiff and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

109.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

110.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII/PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

111.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII/PHI. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

112.    As a result of the recognized risk of identity theft, when a data breach occurs, and when an individual is notified by a company that their PII/PHI was compromised, as in this Data

---

[22] *Id.*

Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

113.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.

114.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate that harm.

115.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

116.    These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[23]

117.    Once PII/PHI is exposed, there is virtually no way to ensure that the exposed

---

[23] *See Federal Trade Commission*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Steps (last visited July 18, 2025).

information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

### Diminished Value of PII/PHI

118.    Personal data like PII/PHI is a valuable property right.[24]

119.    Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII/PHI has considerable market value.

120.    An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[25]

121.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.

122.    For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[26] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[27] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and

---

[24] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII/PHI") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII/PHI, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last visited July 18, 2025).

[25] *Shadowy data brokers make the most of their invisibility cloak* (Nov. 5, 2019) LA TIMES, https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited July 18, 2025).

[26] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/. (last visited July 18, 2025).

[27] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited July 18, 2025).

bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[28] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[29] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[30]

123.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[31] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[32]

124.    As a result of the Data Breach, Plaintiff's and Class Members' PII/PHI, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

125.    However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII/PHI is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

---

[28] Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC Magazine (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last visited July 18, 2025).
[29] *In the Dark*, VPNOverview.com, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited July 18, 2025).
[30] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI Cyber Division (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last visited July 18, 2025).
[31] *The Personal Data Revolutaion,* DATA COUP, https://datacoup.com/ *and How it Works,* DIGI.ME, https://digi.me/what-is-digime/ (last visited July 18, 2025).
[32] *Frequently Asked Questions*, NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited July 18, 2025).

***Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary***

126.    To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered due to the Data Breach.

127.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the PII/PHI for identity theft crimes— e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

128.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

129.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement.[33]

130.    The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as dates of birth and medical information).

131.    Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

---

[33] Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds,* FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-securitynumber-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited July 18, 2025).

132.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII/PHI.

### *Lost Benefit of the Bargain*

133.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

134.    When agreeing to provide their PII/PHI, Plaintiff and Class Members, as patients and customers, understood and expected that they were, in part, paying for services and data security to protect the PII/PHI they were required to provide.

135.    Plaintiff values data security. Indeed, data security is an important consideration when seeking medical serivcies.

136.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[34] Therein, Cisco reported the following:

> a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[35]

---

[34] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited July 18, 2025).
[35] *Id*. at 3.

b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[36]

c.    89% of consumers stated that "I care about data privacy."[37]

d.    83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[38]

e.    51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[39]

f.    75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[40]

### *Defendant Could Have Prevented the Data Breach*

137.    Data breaches are preventable.[41] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[42] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[43]

---

[36] *Id.*
[37] *Id.* at 9.
[38] *Id.*
[39] *Id.*
[40] *Id.* at 11.
[41] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).
[42] *Id.* at 17.
[43] *Id.* at 28.

138.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [44]

139.    In a Data Breach like the one here, many failures laid the groundwork for the Breach.

140.    For example, the FTC has published guidelines that establish reasonable data security practices for businesses. The guidelines also emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

141.    Additionally, several industry-standard best practices have been identified that—at a minimum—should be implemented by businesses like Defendant.

### Defendant Failed to Adhere to FTC Guidelines

142.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII/PHI.

143.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should:

    a.    protect the personal customer information that they keep;

    b.    properly dispose of personal information that is no longer needed;

---

[44] *Id.*

      c.      encrypt information stored on computer networks;

      d.      understand their network's vulnerabilities; and

      e.      implement policies to correct security problems.

144.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

145.    The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

146.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

147.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII/PHI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

### *Defendant Failed to Follow Industry Standards*

148.    Experts studying cyber security routinely identify corporations as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

149.    Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

150.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

151.    Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. In line with industry standard practices, Defendant should have promptly deleted the data belonging to former patients.

152.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04)

and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

153.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

### *Defendant Violated HIPAA*

154.    HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained.[45]

155.    The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

- failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

- failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

- failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

- failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

---

[45] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

- failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

- failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

- failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

- failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

- failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

*156.*    Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

157.    Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII/PHI was compromised in the Data Breach of DotHouse Health, Inc.'s network, including all those individuals who received notice of the breach.

158.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including its staff and immediate family.

159.     Plaintiff reserves the right to amend the class definition.

160.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

161.     This action satisfies the numerosity, commonality, typicality, and adequacy requirements.

162.     **Numerosity.** The Class members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 185,795 members.

163.     **Commonality and Predominance.** Plaintiff's and the Class Members' claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

      a.    if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII/PHI;

      b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.   if Defendant was negligent in maintaining, protecting, and securing PII/PHI;

d.   if Defendant breached contract promises to safeguard Plaintiff and the Class's PII/PHI;

e.   if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f.   if Defendant's Breach Notice was reasonable;

g.   if the Data Breach caused Plaintiff and the Class injuries;

h.   what the proper damages measure is; and

i.   if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

164.   **Typicality.** Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

165.   **Adequacy.** Plaintiff will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

166.   **Appropriateness.** The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case. Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

167.    **Ascertainability.**    All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some victims and sent them data breach notices.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

168.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

169.    Plaintiff and the Class entrusted their PII/PHI to Defendant on the premise and with the understanding that Defendant would safeguard their PII/PHI, use their PII/PHI for medical purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

170.    Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

171.    Defendant's duty of care is an independent, non-contractual duty of care arising from the special relationship between Defendant and Plaintiff, and the fact Defendant assume responsibility to collect and store Plaintiff and the Class Member's PII/PHI.

172.    Defendant has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiff and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

173.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff's and Class Members' PII/PHI.

174.    Defendant owed—to Plaintiff and Class Members—at least the following duties to:

    a.    exercise reasonable care in handling and using the PII/PHI in its care and custody by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII;

    b.    to adequately monitor the security of its networks and systems;

    c.    to prevent unauthorized access to Plaintiff and Class members PII;

    d.    to detect, in a timely manner, that Plaintiff's and Class members' PII had been compromised; and

    e.    to remove former patients' PII it was no longer required to retain pursuant to regulations from its systems.

175.    Plaintiff and Class members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; Also, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

176.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

177. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

178. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII/PHI, a necessary part of receiving medical services from Defendant.

179. The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendant holds vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII/PHI —whether by malware or otherwise.

180. PII/PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiff's and Class Members' and the importance of exercising reasonable care in handling it.

181. Defendant improperly and inadequately safeguarded the PII/PHI of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

182. Defendant breached these duties as evidenced by Data Breach.

183. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff 'and Class Members' PII/PHI by:

      a.    disclosing and providing access to this information to third parties and

b.      failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

184.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the PII/PHI of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff's and Class Members' injury.

185.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and Class Members' injuries-in-fact.

186.    Defendant has admitted that the PII/PHI of Plaintiff and the Class was accessed by an intruder to its systems.

187.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

188.    Furthermore, Defendant's grossly negligent conduct is underscored by the fact it waited 958 days before notifying Plaintiff that her data had been compromised, and did not even realize its computer systems had been breached for twenty-seven days.

189.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost value of their PII/PHI, and lost time and money

incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Negligence *per se***
**(On Behalf of Plaintiff and the Class)**

190.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

191.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data. Plaintiff and Class members are within the class of persons that Section 5 of the FTCA was intended to protect. The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTCA intended to guard against. Defendant violated Section 5 of the FTCA by failing to adequately safeguard Plaintiff's and Class members' PII.

192.    Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII/PHI.

193.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

194.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

195.    Defendant's duty to use reasonable security measures also arose under the HIPPA, under which they were required to protect the security, confidentiality, and integrity of consumer health information. The harm occurring as a result of the Data Breach is the type of harm that the HIPPA intended to guard against. Defendant violated the HIPPA by failing to adequately safeguard Plaintiff's and Class members' PII.

196.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

197.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII/PHI.

198.    Defendant's violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

199.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

<u>**THIRD CAUSE OF ACTION**</u>
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

200.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

201.    Defendant offered to provide medical services to Plaintiff and members of the Class if, and in exchange, Plaintiff and members of the Class provided Defendant with their PII/PHI.

202.    In providing their PII, Plaintiff and Class members entered into an implied contract with Defendant, whereby Defendant, in receiving such data, became obligated to reasonably safeguard Plaintiff's and the other Class members' PII.

203.    Plaintiff and the members of the Class accepted Defendant's offer by providing PII/PHI to Defendant in exchange for medical services.

204.    Implicit in the agreement between Plaintiff and Class members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for medical purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

205.    Plaintiff and the members of the Class would not have entrusted their PII/PHI to Defendant in the absence of such an agreement with Defendant.

206.    Defendant accepted possession of Plaintiff's and Class members' PII.

207.    Had Defendant disclosed to Plaintiff and Class members that Defendant did not have adequate computer systems and security practices to secure consumers' PII, Plaintiff and Class members would not have provided their PII to Defendant.

208.    Defendant recognized that consumers' PII is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and Class members.

209.    Plaintiff and Class members fully performed their obligations under the implied contracts with Defendant.

210.    Defendant materially breached the contracts it had entered with Plaintiff and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusions into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiff and members of the Class by:

      a.    Failing to properly safeguard and protect Plaintiff's and members of the Class's PII/PHI;

      b.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

      c.    Failing to ensure the confidentiality and integrity of electronic PII/PHI that Defendant created, received, maintained, and transmitted.

211.    As a direct and proximate result of the breach of the contractual duties, Plaintiff and Class members have suffered actual, concrete, and imminent injuries. The injuries suffered by Plaintiff and the Class members include: (a) the invasion of privacy; (b) the compromise, disclosure, theft, and unauthorized use of Plaintiff's and Class members' PII; (c) economic costs associated with the time spent to detect and prevent identity theft, including loss of productivity; (d) monetary costs associated with the detection and prevention of identity theft; (e) economic costs, including time and money, related to incidents of actual identity theft; (f) the emotional distress, fear, anxiety, nuisance and annoyance of dealing related to the theft and compromise of their PII; (g) the diminution in the value of the services bargained for as Plaintiff's and Class members were deprived of the data protection and security that Defendant promised when Plaintiff and the Class members entrusted Defendant with their PII; and (h) the continued and substantial

risk to Plaintiff's and Class members' PII, which remains in the Defendant's possession with inadequate measures to protect Plaintiff's and Class members' PII.

212.    Additionally, the covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

213.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

214.    Defendant failed to adequately advise Plaintiff and members of the Class of the Data Breach, and failed to send Notice to the victims promptly and sufficiently.

215.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

216.    Plaintiff and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

217.    Plaintiff, on behalf of herself and the Class, seeks compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

218.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

219.    Upon information and belief, Defendant funds its data security measures from its general revenue, including the money generated from Plaintiff's and the Class Members' payment for medical services, and payments made by or on behalf of Plaintiff and the Class Members.

220.    As such, a portion of the revenue gleaned from Plaintiff's and the Class Members' payment for medical services is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that should be allocated to data security is known to Defendant.

221.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased medical services from Defendant and in so doing provided Defendant or its agents with their PII/PHI. In exchange, Plaintiff and Class Members should have had their PII/PHI protected with adequate data security.

222.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII/PHI of Plaintiff and Class Members for business purposes.

223.    Defendant was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII/PHI. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to avoid the data security obligations at the expense of Plaintiff and the Class by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

224.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

225.    Defendant acquired the monetary benefit and PII/PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

226.    If Plaintiff and Class Members knew that Defendant had not secured their PII/PHI, they would not have agreed to provide their PII/PHI to Defendant.

227.    Plaintiff and Class Members have no adequate remedy at law.

228.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity how their PII/PHI is used; (ii) the compromise, publication, and/or theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII/PHI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII/PHI in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class.

229.    Defendant should be compelled to disgorge into a common fund or constructive

trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them.

**FIFTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

230.    Plaintiff incorporates all previous paragraphs as if fully set forth herein.

231.    Plaintiff and Class Members had a legitimate expectation of privacy regarding their PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

232.    Defendant owed a duty to Plaintiff and Class Member to keep their PII/PHI confidential.

233.    The State of Massachusetts recognizes the tort of Invasion of Privacy. Under M.G.L. c.214, § 1B, "A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

234.    A plaintiff bringing an invasion of privacy claim in Massachusetts under M.G.L. c.214, § 1B must show that there was: (1) a gathering and dissemination of facts of a private nature that (2) resulted in an unreasonable, substantial or serious interference with his privacy. Branyan v. Sw. Airlines Co., 105 F. Supp. 3d 120, 126 (D. Mass. 2015).

235.    The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiff's and Class Members' PII/PHI is highly offensive to a reasonable person. It constitutes an unreasonable, substantial or serious invasion of privacy both by disclosure of nonpublic facts, and intrusion upon seclusion.

236.    The subsequent publication of the stolen PII on the Dark Web also constitutes an unreasonable, substantial or serious invasion of privacy.

237.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class members disclosed their sensitive and confidential information to Defendant as part of seeking Defendant's services, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

238.    The Data Breach constitutes an intentional interference with Plaintiff's and the Class members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

239.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

240.    Defendant acted with a knowing state of mind when it failed to notify Plaintiff's and the Class members in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

241.    Defendant had notice and knew or should have known that its inadequate cybersecurity practices would cause injury to Plaintiff's and the Class members.

242.    Because Defendant failed to properly safeguard Plaintiff's and Class Members' PII/PHI, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

243.    As a proximate result of Defendant's acts and omissions, the PII/PHI of Plaintiff and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

244.     Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII/PHI is still maintained by Defendant with their inadequate cybersecurity system and policies.

245.     Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their PII/PHI. A judgment for monetary damages will not end Defendant's inability to safeguard the PII/PHI of Plaintiff and the Class.

246.     Plaintiff and Class Members, seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' PII/PHI.

247.     Plaintiff and Class Members seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

### SIXTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

248.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

249.     Given the relationship between Defendant and Plaintiff and the Class Members, where Defendant became guardian of Plaintiff's and Class Members' PII/PHI, Defendant became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PII/PHI; (2) to timely notify Plaintiff and Class Members of the Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

250.     Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII/PHI.

251.     Because of the highly sensitive nature of the PII/PHI, Plaintiff and Class members

(or their third-party agents) would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII/PHI had they known the reality of Defendant's inadequate data security practices.

252.    Defendant breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII/PHI.

253.    Defendant also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach within a reasonable and practicable time period.

254.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## SEVENTH CAUSE OF ACTION
### Declaratory Judgment
### (On Behalf of Plaintiff and the Class)

255.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

256.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

257.    In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

258.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendant's breaches of its duties caused—and continues to cause— injuries to Plaintiff and Class members.

259. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

260. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences another data breach.

261. And if another breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages— while warranted for out-of-pocket damages and other legally quantifiable and provable damages— cannot cover the full extent of Plaintiff and Class members' injuries.

262. If an injunction is not issued, the resulting hardship to Plaintiff and Class members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

263. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class members, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of all others similarly situated, prays for relief as follows:

    a.   For an order certifying the Class, and naming Plaintiff as representatives of the Class, and Plaintiff's attorneys as Class Counsel;

    b.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

    c.   For damages in an amount to be determined by the trier of fact;

    d.   For an order of restitution and all other forms of equitable monetary relief;

    e.   Declaratory and injunctive relief as described herein;

    f.   Awarding Plaintiff reasonable attorneys' fees, costs, and expenses as otherwise allowed by law;

    g.   Awarding pre- and post-judgment interest on any amounts awarded; and

    h.   Awarding such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the putative Class, demands a trial by jury on all claims so triable.

Dated: July 18, 2025

By: */s/ Anthony Paronich*
Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(617) 485-0018
anthony@paronichlaw.com

52

Raina C. Borrelli (*pro hac vice* anticipated)
STRAUSS BORRELLI, PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

*Attorneys for Plaintiff and the Proposed Class*